UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| EARL SIDNEY DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 09-CV-3336 |
| | ) | |
| LARRY J. PHILLIPS, | ) | |
| TARRY WILLIAMS, | ) | |
| SHON C. ORILL, | ) | |
| RICHARD A. LOGAN, | ) | |
| SETH C. WESSEL, | ) | |
| GEORGE LAY, | ) | |
| SANDRA SIMPSON, | ) | |
| GUY GROOT, | ) | |
| JAMES HAAGE, | ) | |
| JANE DOES 1-2, and | ) | |
| DONALD G. DANIELS, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

OPINION

SUE E. MYERSCOUGH, U.S. District Judge:

Plaintiff is detained in the Rushville Treatment and Detention

Center pursuant to the Illinois Sexually Violent Persons Act.  He alleges

excessive force, unconstitutional application of the "black box" restraint,

1

an unconstitutional disciplinary hearing, and the alleged refusal to remove or loosen Plaintiff's restraints so that he could use the restroom while on a court writ.

The excessive force claim against Defendants Daniels and Logan was stayed until Daniels returned from serving overseas. The other claims proceeded and are now at the summary judgment stage. Daniels has since returned and dispositive motions on the excessive force claim against him and Logan are due March 30, 2012.

Now before the Court are summary judgment motions by all the Defendants except for Defendant Daniels. For the reasons below, the motion for summary judgment by Defendants Groot and Simpson will be granted in full. The motion for summary judgment by Defendants Haage, Lay, Logan, Orrill, Phillips, Wessel, and Williams will be granted in part and denied in part. Left standing will be the excessive force claims against Daniels, Logan, and Orill arising from the events on April 24, 2008, and the restroom claim against Lay and Wessell arising from the incident on May 22, 2008. These claims will be set for trial, though the remaining Defendants will have another opportunity to file for

summary judgment on them.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A movant may demonstrate the absence of a material dispute through specific cites to admissible evidence, or by showing that the nonmovant "cannot produce admissible evidence to support the [material] fact." Fed. R. Civ. P. 56(c)(B). If the movant clears this hurdle, the nonmovant may not simply rest on his or her allegations in the complaint, but instead must point to admissible evidence in the record to show that a genuine dispute exists. Id.; Harvey v. Town of Merrillville, 649 F.3d 526, 529 (7th Cir. 2011). "In a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forward with sufficient evidence to create genuine issues of material fact to avoid summary judgment." McAllister v. Price, 615 F.3d 877, 881 (7th Cir. 2010).

At the summary judgment stage, evidence is viewed in the light

most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant.  <u>Id.</u>

## FACTS

Plaintiff has been adjudicated a sexually violent person pursuant to the Illinois Sexually Violent Persons Act.  He is 69 years old (Plaintiff's Dep. p. 4) and is currently detained in the Rushville Treatment and Detention Center in Rushville, Illinois.  Before that, he was detained in the Treatment and Detention Center in Joliet, Illinois.

In 2008, Plaintiff won a lawsuit against administrators at the Joliet facility regarding the application of a restraint called the "black box" to him pursuant to a policy adopted in 2000 which applied to all residents and which was adopted in response to an escape by two residents.  <u>Davis v. Peters</u>, 566 F.Supp.2d 790 (N.D. Ill., 2008)(Judge Pallmeyer).  The black box  is a "rectangular device measuring approximately four inches by three inches. . . .  When placed over the chain of a pair of handcuffs, it both limits a prisoner's ability to move his hands, and prevents access to

the handcuffs' keyholes." 566 F.Supp.2d at 798-99 (picture included in opinion). The court in that case concluded that the facility director "failed to exercise professional judgment in determining that the highly restrictive black box system would be universally applied to TDF[1] detainees beyond an initial six-month period." Id. at 818-19. Plaintiff testified in that case that the black box caused his wrists to chafe and swell and claimed that the black box caused "'knots'" on his wrists along with "muscle weakness and pain." Id. at 800. Judge Pallmeyer award Plaintiff $1,102.50 in compensatory damages. Id. at 821.

In 2006, Plaintiff was transferred to Rushville Treatment and Detention Center. According to Plaintiff, the medical staff at the Joliet facility had given him one-half of an Ace bandage to wrap around each wrist while on writs and allowed him to wear larger cuffs on those writs, in light of his problems with the black box. This practice continued at Rushville initially, according to Plaintiff. However, no medical order existed at Rushville at that time for the bandages or the larger cuffs.

---

[1]"TDF" stands for "Treatment and Detention Facility."

(Plaintiff's Dep. p. 80-81).

On April 24, 2008, Plaintiff was scheduled to travel to the Madison County Courthouse for a hearing in his commitment proceedings under the Illinois Sexually Violent Persons Act. Plaintiff taped the Ace bandages to his wrists, but when he arrived at the intake cell for processing he saw that Defendant Orrill, a security guard, had "small steel cuffs" and a belly chain, with the cuffs attached to the waist chain. According to Defendants, the steel cuffs were the standard size cuffs, but Plaintiff maintains that the "standard handcuffs are not bolted to [the] waist chain." (d/e 68, p. 16). Plaintiff contends that the standard size cuffs are about 3/4" larger than the "small steel handcuffs" and are not bolted to the waist chain. (d/e 71, p. 8). The large cuffs are used when required by a medical permit. Further, Plaintiff also asserts that the large cuffs are used without a medical permit if a resident is "big boned." He additionally maintains that he was permitted to wear the large cuffs until the April, 2008 writ.

Plaintiff told Defendant Orrill that he needed the larger cuffs for his wrists. (Plaintiff's Dep. pp. 21-22). Orrill responded that he had

checked with "medical," that no medical order for larger cuffs existed, and that Plaintiff was going to have to wear the smaller cuffs. Id. at 25-26. Plaintiff protested, asserting that he would prefer not going to court than wearing the smaller cuffs. According to Plaintiff, Orrill became irate:

> Plaintiff: He [Orrill] run up on me so fast that I really didn't have time to move. And his feet kicked my feet, and he come straight up under my chin with them cuffs on his hands, and he hit my chin. I went back this way. I had already moved back. And he said I have a court order and you're wearing these and you're going, something to that effect. And I said oh. I knew then, I mean, his face was red and veins jumping out. I knew then I was in trouble.
>
> Question: Did you suffer any injury from being hit in the chin?
>
> Plaintiff: My chin didn't hurt that bad; but, I mean, he hit it, it hurt. But I didn't suffer no injuries on that.
>
> Question: Okay.
>
> Plaintiff: Although he did assault me. I mean, he contacted.
>
> Question: Okay. And when you say he contacted, the toes of his boots contacted the toes of your shoes?
>
> Plaintiff: Yeah, and he had - - okay, the chain is dangling this way because they're bolted on to the waist chain. And he had one around each hand like brass knuckles. And when he

come up, he come up like that and hit me in the chin right here.

Question: Okay.

Plaintiff: It didn't break the skin or nothing. I got false teeth anyway.

Question: After - -

Plaintiff: It didn't feel good.

(Plaintiff's Dep. pp. 27-28).

Later in his deposition Plaintiff describes the encounter thus:

Question: . . . that Orrill came towards you and that the tips of your shoes touched each other and he brought his fists up underneath your chin?

Plaintiff: He had the handcuffs around his fists like brass knuckles, and he come under my chin like that.

Question: Did he punch you?

Plaintiff: He contacted. He contacted. So you could consider it a punch. I would.

Question: Was there force?

Plaintiff: He contacted. He didn't knock me down or nothing like that. He hit me under there, you know, a little harder than that.

Question: In your complaint it said that it knocked you

backwards?

Plaintiff: No, when he kicked my shoes is what knocked me backwards.

Question: Oh. So did you fall down?

Plaintiff: No.

Question: Did you back into the wall?

Plaintiff: I caught myself as I was going back. No, I only went back about that far. What he did, he went real fast.

Question: Wait. Just for the record, so you're holding your hands apart about what, what's that, a foot?

(Plaintiff's Dep. pp. 89-90).

Defendant Williams, the Captain of Security, was called to the scene. Williams told Plaintiff that he would have to take off the Ace bandages and wear the smaller cuffs or refuse to go on the writ. Plaintiff chose the former option since he did not want to miss what he believed would be an important hearing in his detention case. (Plaintiff's Dep. p. 30). Plaintiff took off the bandages and Orrill applied the handcuffs.

Arriving at the courthouse, Plaintiff met with his attorney before the court hearing. Plaintiff mentioned that he needed to get in touch

with his appellate attorney to tell him of some necessary changes to an appellate brief due in a few days. Plaintiff's attorney used his cell phone to dial the appellate attorney and then handed the phone to Plaintiff so that Plaintiff could relay the changes about the appellate brief. Seeing Plaintiff on the cellphone, Defendants Orrill, Daniels, and Logan rushed in and directed Plaintiff to get off the phone (using a cell phone is against the facility rules). Plaintiff's lawyer felt he had been threatened and said, "'I'm tired of being threatened by DHS staff and I am going to talk to the Judge about it.'" (Delaney Aff., 68-3). Plaintiff's attorney departed the room, followed by Defendant Orrill. Plaintiff arose from his chair, believing that he would be taken back to his holding cell. (Plaintiff Dep. p. 38). Plaintiff testified that Defendants Daniels and Logan then "grabbed me by the throat and the chest and body slammed me on that stool. Part of my back hit this and the rest of me hit that . . . ." (Plaintiff's Dep. p. 35). Plaintiff further testified, "They grabbed me by the throat and by the clothing. Now I'm chained, I'm chained down with them handcuffs on and that. And I got leg shackles on. And they picked me up that high off the ground and just body slammed me straight down

on that stool." Id. at 37.

Plaintiff was in pain, which became worse during the day and especially in the days following. He testified that he "was hurt so bad on the way back, I couldn't hardly sit in the chair; it hurt. And when we got back, I was having bad problems. . . . [I]t got so bad that I had to, I was doing 750, not 750, but those Ibuprofen 800, I was doing them three times a day and still in pain." (Plaintiff's Dep. p. 37). He did not mention his back pain when he returned from the writ, but according to Plaintiff he did complain of pain, redness, and swelling in his wrists. (Plaintiff's Dep. p. 47). Plaintiff put in a request for medical care about his back two days later because "it was getting so bad I could hardly walk, . . . ." (Plaintiff's Dep. p. 48).

On May 6, 2008, Plaintiff received a notice to appear before the Behavior Committee on charges of "threats and intimidation" arising from the incident in the intake cell on April 24, 2008. (d/e 68-2). Plaintiff was accused of saying, "You better call Staff and tell him to put the gloves on because there is going to be a fight." Id. On the incident report, Eugene McAdory, the Security Director, wrote that Plaintiff's file

should be reviewed for a "change in restraints, black box (cont'd problems & issues on writs)."[2] (d/e 68-3). Plaintiff believes that this is evidence that McAdory essentially directed the Behavior Committee to find Plaintiff guilty.

The Behavior Committee—consisting of Defendants Groot, Haage, and two unidentified females—did find Plaintiff guilty, classifying the offense as a major one. Plaintiff was not allowed to call his eyewitness, whom he believed would exonerate him.[3] The facility's policy requires black boxes to be used on any resident found guilty of a major violation within the past year, when traveling on writs outside the facility. Plaintiff was also demoted from grade A to grade B, which meant that he was denied the privilege of purchasing musical instruments and also denied other unspecified privileges.

Plaintiff saw the facility's doctor on May 5, 2008. His medical

---

[2]Plaintiff's motion to add McAdory as a defendant was denied by Judge Baker on grounds of undue delay. (d/e 49; 6/3/11 text order). Even if McAdory were a defendant, no evidence supports a finding that he knew that the black box or larger restraints were medically indicated for Plaintiff.

[3]The parties dispute whether Plaintiff followed proper channels to request his witness, but this dispute is immaterial.

records from that day note tenderness and bilateral wrist pain.  Plaintiff

was referred for testing to rule out carpal tunnel syndrome, and the

doctor authorized Plaintiff to use wrist splints.  (d/e 68-3, p. 16).  Id.

However, no prescription or order regarding restraints appears to be in

this medical entry.

Plaintiff had to wear the black box in mid-May, 2008 while on the

medical writ to run tests on his wrists.  The test apparently came back

positive for "mild carpal tunnel syndrome."  (Plaintiff's Dep. pp. 55-56).[4]

Upon returning from that writ, Plaintiff visited healthcare; medical notes

from that day reflect "mild swelling and heat and redness" and

"considerable shaking in hands."  (d/e 68-3, p. 18).

Plaintiff also had to wear the black box on May 22, 2008 on

another writ to the Madison County Courthouse.  According to

Plaintiff's complaint, Plaintiff asked the judge at his hearing if the black

---

[4]Plaintiff injured his right wrist when he was twelve years old, when he fell and cut himself on a piece of broken glass, requiring surgery.  (Plaintiff's Dep. p. 65-67). He also has rheumatoid arthritis in his joints and Raynaud's Syndrome in his feet and fingers.  (Plaintiff's Dep. pp. 67, 93).  According to Plaintiff, Raynaud's Syndrome decreases the blood flow to his toes and fingers when they become cold, numbing them.  Id. at 93.  He also had neck surgery when he was incarcerated in Arizona on an unspecified date, requiring him to wear a neck brace for one year.  Id. at 95.

box and cuffs could be removed to enable Plaintiff to use the restroom.

Defendants Wessel and Lay allegedly assured the judge that they would

remove both restraints when they escorted Plaintiff to the restroom after

the hearing.[5]  Instead, Wessel and Lay refused to remove either restraint,

laughing at Plaintiff while he tried to unzip his pants and urinate.

(Plaintiff's Dep. p. 72).  Upon returning from his May 22, 2008 court

writ, Plaintiff filed a health care request reporting swollen wrists, severe

pain, and no feeling in parts of his hands, wrists, and arms.  His medical

records noted redness and swelling.  (d/e 68-3, p. 21).

On May 27, 2008, Plaintiff was seen by the facility's doctor

regarding his wrists.  The doctor wrote on Plaintiff's medical notes

"please use method other than 'black box' to secure this resident."  (d/e

68-3, p. 23).  After that the black box was not used, and Defendant

Williams ordered that the smaller steel cuffs be used.  Dr. Lochard at that

---

[5]Plaintiff has also submitted a 2001 Madison County Court Order directing
that his shackles and handcuffs be removed in order to allow him to use the restroom.
(d/e 68-3, p. 14).  The case number is illegible on this order, and the order does not
state a time limit.  The record is silent on whether the order was still in force during
the events in this case.  The record is also silent on whether Defendants Lay and
Wessell were aware of this order.

time had not ordered that the larger cuffs be used. Plaintiff apparently had carpal tunnel surgery on his right wrist sometime after May and before November 20, 2008. (d/e 68-2, p. 25). At some point after the incidents in this case, Dr. Lochard ordered that the larger cuffs be used, according to Plaintiff's deposition testimony. (Plaintiff's Dep. p. 115).

In April 2009, Plaintiff was sent for an x-ray of his spine, due to his continued reports of back pain. The x-ray showed "degenerative disc disease." (d/e 68-3, p. 33). Plaintiff believes that this x-ray shows a healed-over injury which had been caused by the "body-slam" at the courthouse, but this belief is based on speculation, not admissible evidence.

## ANALYSIS

**I. Judging the amount of force used by Defendant Orrill on April 24, 2008 is not possible on paper. Accordingly, Plaintiff's excessive force claim arising from this incident survives summary judgment.**

Plaintiff's legal status is analogous to that of a pretrial detainee, meaning his claims are analyzed under the Fourteenth Amendment's due process clause, not the Eighth Amendment. "The Fourteenth Amendment right to due process provides at least as much, and probably

more, protection against punishment as does the Eighth Amendment's ban on cruel and unusual punishment." Forrest v. Prine, 620 F.3d 739, 744 (7th Cir. 2010); Lewis v. Downey, 581 F.3d 467, 474 (7th Cir. 2009)(in an excessive force claim, due process clause prohibits all "punishment," providing "broader protection" than the Eighth Amendment, "[a]lthough the exact contours of any additional safeguards remain undefined . . . .").

However, even an excessive force claim under the Fourteenth Amendment must involve more than de minimis force. Excessive force under the Fourteenth Amendment is "force that amounts to punishment." Graham v. Connor, 490 U.S. 386, 395 n. 10 (1989). De minimis force cannot plausibly be considered "punishment" in the Court's view, otherwise a guard's every "push or shove" of a pretrial detainee would give rise to a constitutional claim. *See* id. at 396 ("'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' Johnson v. Glick, 481 F.2d, at 1033, violates the Fourth Amendment."); Peterson v. Meris, 2011 WL 3203675 *3 (N.D. Ill. 2011)(unpublished)("The Seventh Circuit has noted that the de

minimis doctrine applies '[i]n constitutional tort cases (including cases brought to vindicate rights created by the Fourth Amendment) as elsewhere in the law' . . . . As such, an excessive force claim cannot be predicated on a de minimis use of physical force.")(citation omitted).

Summary judgment in an excessive force case is rarely appropriate because resolving the dispute often requires choosing one party's version over the other's: the Court cannot make credibility determinations at this stage. O'Leary v. Accretive Health, Inc., 657 F.3d 625, 630 (7th Cir. 2011)("'It is not for courts at summary judgment to weigh evidence or determine the credibility of [a witness's] testimony;").

Defendants argue that Plaintiff's own description of this incident demonstrates that de minimis force was used. The Court agrees this is one plausible inference that arises from Plaintiff's testimony. However, his testimony also might support a contrary inference.[6] For example, the Court cannot tell what Plaintiff meant when he testified, "He hit me under there, you know, a little harder than that." How hard is "harder

---

[6]Plaintiff alleges in his complaint that Orrill committed "assault and battery," which may be an attempt to pursue state law claims. However, the parties do not address this issue.

than that?"  The Court realizes Plaintiff suffered no injuries, but that is

not necessarily dispositive of his claim.  *See, e.g.,* <u>Penn v. Harris</u>, 296

F.3d 573, 577 (7th Cir. 2002)(jury found excessive force was used in

arrest, but did not award damages because force caused no injuries).[7]  He

might still be entitled to nominal damages.

## II.    Plaintiff had no protected liberty interest in avoiding the black box or maintaining his grade status.  Therefore, he was not entitled to procedural due process before those deprivations were imposed.

After Plaintiff won his black box case in the Northern District, the

Seventh Circuit held in another case that a demotion to "close status"[8]

and the application of the black box on writs for a year because of a

"major violation" did not trigger procedural due process protections.

---

[7]<u>Penn</u> involved a Fourth Amendment claim for excessive force in arrest, not an excessive force claim under the Fourteenth Amendment due process clause.  However, the Fourth Amendment's objective standard may be relevant in excessive force claims under the Fourteenth Amendment.  *See* <u>Titran v. Ackman</u>, 893 F.2d 145, 147 (7th Cir.1990)( "Most of the time the propriety of using force on a person awaiting trial will track the Fourth Amendment: the court must ask whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them."); <u>Wilson v. Williams</u>, 83 F.3d 870 (7th Cir. 1996)(fourth amendment objective factors were relevant to determining intent to punish pretrial detainee; force must be "objectively unreasonable in light of the facts and circumstances of the time.").

[8]"Close status" in the <u>Miller</u> case meant a restriction of privileges such as curfew time, yard and exercise time, library use, and participation in special events.

<u>Miller v. Dobier</u>, 634 F.3d 412 (7th Cir. 2011); <u>Levi v. Thomas</u>, Appeal

No. 10-3854, 429 Fed.Appx. 611 *2 (7th Cir. 2001)(detainee under

Illinois Sexually Violent Persons Act had no substantive or procedural

due process claim based on black box because he had no protected liberty

interest in avoiding the black box).[9]  Accordingly, Plaintiff had no right to

procedural due process before his grade demotion and the imposition of

the black box.  He had no constitutional right to call witnesses or to an

impartial adjudicator.  In other words, these restrictions could have been

imposed on him with no hearing at all because the deprivations he

suffered were not serious enough to amount to constitutionally protected

liberty interests.

In short, requiring Plaintiff to wear the black box because he had

been found guilty of a major rule violation was a decision within the

security personnel's discretion, absent a medical order directing otherwise

or a contraindication that would be obvious even to a layperson.

Allowing Plaintiff to wear large cuffs before April 2008 was also within

_____

[9]<u>Levi</u> is unpublished and therefore not precedential, but the reasoning is
persuasive.  If the black box  is not an "atypical and significant hardship," its use could
not logically violate the substantive due process clause.

that discretion.  The black box policy, as a general rule, affects no constitutionally protected interest.

## III.  Defendants were not deliberately indifferent to any substantial risk of harm presented by the cuffs or the black box.

As discussed above, the restraints used did not, as a general matter, implicate any constitutional rights.  Nevertheless, Defendants might still be liable if they were aware that applying those restraints presented a substantial risk of harm to Plaintiff because of Plaintiff's purported medical need for the larger cuffs.  *See* Board v. Farnham, 394 F.3d 469, 478 (7th Cir. 2005)("[T]he plaintiff has the burden of showing that: (1) the harm to the plaintiff was objectively serious; and (2) the official was deliberately indifferent to [that harm].").

Plaintiff asserts that his prior problems with the black box in Joliet, coupled with his repeated pleas for Defendants to use the large cuffs and his repeated complaints of pain from the restraints put Defendants on notice that he needed the large cuffs to avoid pain and injury to his wrists.  However, as discussed above, nothing about the black box or restraints applied, by themselves, presents an "'atypical and significant

hardship.'" <u>Miller v. Dobier</u>, 634 F.3d 412, 414-15 (7th Cir. 2011)(*quoting* <u>Sandin v. Conner</u>, 515 U.S. 472, 485-86(1995). Plaintiff admits that he had no medical order for the Ace bandage or large cuffs when he went on the writs in April and May of 2008, nor any medical order prohibiting use of the black box. Accordingly, a rational juror would be hard pressed to find that those restraints posed a substantial risk of serious harm to Plaintiff.

Even if the restraints did pose such a risk, no evidence exists that Defendants were aware of the risk, much less disregarded it. Orrill checked with the medical staff on April 24, 2008, to confirm that no medical orders for large cuffs existed. The only medical order in the record about restraints is one written after the May 22d writ, asking that the black box not be used.[10] That order was followed. No evidence suggests that Plaintiff even asked the doctor to write him any order

---

[10]The medical records from May 8, 2008, appear to record that Plaintiff's wrists were tender and swollen. He was referred for testing for carpal tunnel syndrome and allowed to wear a wrist splint. (d/e 68-3). However, there does not appear to be anything in the medical records that day mentioning restraints (though the records are not entirely legible). Nor is there any evidence that the Defendants who applied the black box to Plaintiff later in May 2008 were aware of the medical records from May 8.

allowing large cuffs before the writs in April and May 2008.

Nor is there any evidence indicating that a substantial risk of harm was so obvious that a layperson would have known of that risk, despite the lack of medical confirmation. Plaintiff did protest the use of the restraints but that alone is not enough to put Defendants on notice of a substantial risk. Further, no evidence suggests that the Defendants accompanying Plaintiff on the writs were aware of substantial harm being suffered by Plaintiff from the restraints during the transport.

## IV. At this point, the record does not support an award of summary judgment for Defendant Logan on the alleged excessive force incident on May 22, 2008.

This claim was stayed while Defendant Daniels served overseas. That stay was lifted when Daniels returned. The dispositive motion deadline on this claim is March 30, 2012, but Defendant Logan moves for summary judgment on it now. This is permissible, since a summary judgment motion may be filed at any time. South Austin Coalition Community Counsel v. SBC Communications, Inc., 274 F.3d 1168, 1171 (7th Cir. 2001).

Plaintiff's description of being "body-slammed" into his seat at the

courthouse does support an excessive force claim.  An inference arises

that the force was strong, unnecessary, and caused Plaintiff significant

pain and difficulty functioning in the days following.  Accordingly,

summary judgment on this claim will be denied.  If Defendants Daniels

and Logan have other evidence that they believe will support summary

judgment in their favor, they may file a supplemental summary judgment

motion on this claim on March 30, 2012.

V.    **Defendants Lay and Wessell do not adequately address the claim against them regarding their refusal to remove the black box when Plaintiff used the restroom at the courthouse on May 22, 2008. Accordingly, this claim remains in the case at this time.**

Plaintiff's description of being forced to urinate with the black box

and cuffs on while Defendants Lay and Wessell watched and laughed

allows a reasonable inference that Lay and Wessell violated Plaintiff's

constitutional rights, even under an Eighth Amendment standard, by

subjecting him to the "wanton infliction of psychological [and perhaps

physical] pain."  Calhoun v. DeTella, 319 F.3d 936, 939 (7th Cir.

2003)(strip search conducted in harassing manner intended to humiliate

and inflict psychological pain stated claim)(bracketed material added).

Defendants do not counter this inference. Defendants argue that they had no authorization to take the restraints off, but they file no affidavits and they do not counter Plaintiff's testimony that they assured the judge they would take off the restraints. Accordingly, summary judgment on this claim is denied at this time, but Defendants Lay and Wessell may move for supplemental summary judgment on the claim by March 30, 2012.

## VI. Summary judgment is mandated for Defendants Groot and Simpson.

Defendant Groot was involved in Plaintiff's disciplinary hearing, which, as discussed earlier, did not violate any of Plaintiff's constitutional rights. Defendant Simpson ruled on Plaintiff's grievances. However, there is no constitutional right to a grievance procedure. *See* <u>Antonelli v. Sheahan</u>, 81 F.3d 1422, 1430 (7th Cir. 1996)("a state's inmate grievance procedures do not give rise to a liberty interest protected by the Due Process Clause."). Accordingly, there is no constitutional claim against Simpson for allegedly creating a sham of the grievance procedure.

IT IS THEREFORE ORDERED:

1) The motion for summary judgment by Defendants Groot and Simpson is granted (d/e 58). Defendants Groot and Simpson are terminated. At the close of this case, the clerk of the court is directed to enter judgment in favor of Defendants Groot and Simpson and against Plaintiff.

2) The motion for summary judgment by Defendants Haage, Lay, Logan, Orrill, Phillips, Wessell, and Williams is granted in part and denied in part (d/e 60). Summary judgment is granted to Defendants on Plaintiff's claim regarding the black box and handcuffs, and his claim regarding the disciplinary hearing. Summary judgment is denied on the excessive force claims against Defendants Daniels, Logan, and Orrill. Summary judgment is denied as to the claim against Defendants Lay and Wessell regarding the restroom incident. Given that the remaining claims implicate only Defendants Daniels, Logan, Orill, Lay, and Wessell, summary judgment is granted to the following Defendants: Haage, Phillips, and Williams. The clerk is directed terminate Defendants Haage, Phillips, and Williams. At the close of this case, the clerk of the court is directed to enter judgment in favor of Defendants Haage,

Phillips, and Williams and against Plaintiff.

3) Defendants' motion to strike is denied as unnecessary (d/e 73).

4) By March 30, 2012, the remaining Defendants may file a summary judgment motion on the remaining claims.

5) A final pretrial conference is scheduled for Monday, September 17, 2012. Defense counsel shall appear in person; Plaintiff shall appear by video conference. The parties are directed to submit an agreed, proposed final pretrial order at least fourteen days before the final pretrial conference. Defendants bear the responsibility of preparing the proposed final pretrial order and mailing the proposed order to Plaintiff to allow Plaintiff sufficient time to review the order before the final pretrial conference. *See* CD-IL Local Rule 16.3.[11]

6) The clerk is directed to issue a video writ to secure Plaintiff's appearance at the final pretrial conference.

7) The proposed final pretrial order must include the names of all witnesses to be called at the trial and must indicate whether the witness

_____

[11]The Local Rules are listed on this District's website: www.ilcd.uscourts.gov. A sample pretrial order is attached to those rules.

will appear in person or by video conference. Nonparty witnesses who are detained at the Rushville Treatment and Detention Center will testify by video. Other nonparty witnesses may appear by video at the Court's discretion. The proposed pretrial order must also include the names and addresses of any witnesses for whom trial subpoenas are sought. The parties are responsible for timely obtaining and serving any necessary subpoenas, as well as providing the necessary witness and mileage fees. Fed. R. Civ. P. 45.

8) A jury trial is scheduled on the Court's trailing trial calendar for Tuesday, November 6, 2012, at 9:00 a.m.. The final date for jury selection and trial will be determined at the final pretrial conference. The trial shall be held by personal appearance of the parties before this Court in Springfield, Illinois.

9) After the final pretrial order is entered, the Clerk is directed to issue the appropriate process to secure the personal appearance of Plaintiff at the trial and the video appearances of the video witnesses at the trial.

ENTERED: March 14, 2012

FOR THE COURT:

                          __s/Sue E. Myerscough__
                               SUE E. MYERSCOUGH
                UNITED STATES DISTRICT JUDGE